HUMPHREY *v.* ONAWAY-ALPENA TELEPHONE• CO.

1. MASTER AND SERVANT—CONTRACTS—COMPENSATION — QUESTION FOR JURY.

In an action against a corporation by an auditor for a balance claimed to be due him as compensation, conflicting testimony as to whether he was to receive expenses in addition to per diem, *held*, to present an issue of fact for the jury.

2. CORPORATIONS—CONTRACTS—BOARD OF DIRECTORS—MINISTERIAL OFFICER—POWERS.

The president, as ministerial officer or agent of a corporation, has no implied power to obligate it by any act or contract which in effect overrules or revokes action taken by its board of directors in relation to the same matter.

204—Mich.—7.

3. MASTER AND SERVANT—CONTRACTS—TERMINATION OF RELATION—
   NOTICE—ADMISSIONS.

   In such action, where plaintiff's own testimony shows that
   he had notice of the action of the board of directors
   terminating his employment at a certain date, there was
   no issue for the jury on the question of notice.

Error to Alpena; Emerick, J. Submitted October
8, 1918. (Docket No. 10.) Decided December 27,
1918.

Assumpsit by Henry Humphrey against the Ona-
way-Alpena Telephone Company for services rendered.
Judgment for plaintiff. Defendant brings error.
Reversed.

*Henry & Henry,* for appellant.

*O'Brien & Francis* (*Kelley & Kelley,* of counsel),
for appellee.

STEERE, J. Plaintiff recovered a verdict and judg-
ment in the circuit court of Alpena county in the sum
of $500 claimed as balance due him under employment
by defendant, as special accountant, or auditor. Ad-
mitting service by him in that capacity under terms
which are partially in dispute defendant contends as
a matter of fact and law that full payment had been
made for all services rendered. The defendant Ona-
way-Alpena Telephone Co. was promoted and incor-
porated with a view to acquiring and holding the fran-
chises and property of three less pretentious organ-
izations known as the Onaway Telephone Co., The
Alpena Mutual Benefit Telephone Co., and an unin-
corporated telephone system belonging to one Frank
Calkins, at Gaylord. This scheme had its origin in
the Onaway Telephone Co., which grew out of a tele-
phone system at Onaway installed and run by John
M. Clark, for a time, and later incorporated by him

with an authorized capitalization of $4,000, which he increased by 1909 to $50,000, he and his wife owning all but three shares. Subsequently they, with some other parties who had become interested, applied for and obtained permission from the Michigan railroad commission to increase their capital stock to $100,000. In 1911, Clark and one Morris T. Streeter, who was a somewhat reckless if not unscrupulous promoter, conceived the idea of organizing and promoting the defendant company to acquire and combine the three systems mentioned. Clark, his wife, and Streeter accordingly organized the defendant Onaway-Alpena Telephone Co. in October, 1911, with a capitalization of $1,000,000, and became its directors at the first stockholders' meeting, Clark being elected president, and his wife secretary and treasurer. They obtained permission from the Michigan railroad commission to sell $180,000 worth of stock, the order providing that they were to pay from the proceeds $20,000 for the Calkins property, $62,250 for the Alpena company and exchange stock of the new corporation for stock of the Onaway Telephone Co. which had been issued and sold. They then entered upon a campaign of stock selling with Streeter as the active sales agent, blank certificates signed by Clark as president and his wife as secretary being liberally turned over to him in that shape for sale and disposed of by him in various ways and amounts to numerous purchasers in different parts of the State. It is indicated that more stock was disposed of by him than the company was authorized to issue. A witness named White, an experienced bookkeeper and accountant, who succeeded Clark's wife as secretary and treasurer, testified of that phase of the situation:

"Going back into these stock transactions, the condition of the stock certificates themselves, if they wanted to find out who had bought any of them and

transferred them, when there were no transfers on the stock certificates, a man could easily put in a year and at the end of that time he would know just about as much as when he started."

It was shown, however, that the company sold and realized on stock to the amount of $162,150, of which $50,000 worth went to Clark in purchase of or exchange for his stock in the Onaway Telephone Co.

Clark, Streeter, and White, who succeeded Clark's wife, constituted the board of directors until July, 1913, when certain of the outside stockholders in different parts of the State became solicitous about their investments and actively interested themselves in the affairs of the company, which at the annual meeting of stockholders in July, 1913, resulted in a change of directors and control of the business of the corporation. The case of *Clark* v. *Onaway-Alpena Telephone Co.*, 196 Mich. 168, may be referred to for further introductory matter, showing conditions and dissensions leading up to the events under consideration here.

In October, 1913, the board of directors consisted of Charles S. Davis and John W. Allen of Adrian, Charles Ruthruff of Jackson, Charles R. Henry of Alpena, and John M. Clark, who for a time continued a member of the board and was retained in the company's employ as its secretary and manager of the physical and mechanical side of the company's affairs after that board acquired control. Davis was elected president and, in addition to his duties in that capacity under the by-laws, was given, by resolution of the board, personal management of the commercial and business side of the corporation "with oversight and authority over all employees," except as delegated by him to others.

A meeting of the directors held in Alpena, on October 21, 1913, was adjourned to October 25th at Jack-

son, where it was attended by four of the five members. Previous to this meeting a project to raise money by bonding had been mooted and the employment of an expert accountant to examine the books and records of the company and ascertain its true financial condition had been discussed by some of the directors. Plaintiff had been recommended to director Allen as an experienced accountant and auditor, and Allen had wired him to come over from Lansing for an interview that day and meet him in Jackson at the union depot. In response he went over to Jackson in the morning and between trains had an interview with directors Allen, Ruthruff and Davis upon the subject of his employment for the purpose proposed. He was at that time engaged on other work which he informed them he must first finish, told them that if employed his terms would be $10 per day (whether with expenses added is a matter in dispute), that he could not give them any estimate how long it would take or the approximate cost of an audit and, in reply to their suggestion that he go up to Alpena to tentatively look things over, said he would do so if they would pay his expenses. At the directors' meeting a resolution was passed authorizing the president to take up with plaintiff "the matter of examining the books, papers and accounts of the company and ascertain if his work will obviate the necessity of having the same work done again when steps are taken to bond the company," and the cost of the same. Davis wrote plaintiff making inquiry along the line of the resolution as did Allen also, to which plaintiff replied telling of his experience but otherwise without answer as to the cost or results, and on November 22, 1913, went to Alpena at Davis' suggestion, returning home before Thanksgiving, and back to Alpena on November 26, 1913, where he remained working in defendant's office most of the time until April 21, 1914. He

testified that he could not and did not tell them how long it would take to make the audit or give them any estimate of the cost. For his services during that period he rendered bills for 119 days at $10 per day and expenses amounting to $387.96, making his total charge $1,577.96, upon which he received payments at different times amounting to $960.38, leaving a claimed balance of $617.58, to recover which, with interest, this action was brought.

Defendant pleaded the general issue with notices of special defense, the substance of which was that his employment was never authorized by the board of directors and no definite or express contract of hiring was ever entered into; that plaintiff never made any report or statement respecting his supposed audit of the books or statement of an accounting to defendant, for which reason his services were of little or no value, and for all services rendered by any implied contract or consent he had been paid in full, and more.

Upon the trial but two material issues developed, though many things were in dispute. Defendant's counsel conceded that upon the record made, and especially a resolution of the board of directors passed February 24, 1914, plaintiff was entitled to pay for his services at the rate of $10 for each day he worked between December 22, 1913, and March 19, 1914, which had been paid in full, but contended that, both by the tentative terms he had stated and said resolution, he was to pay his own board and other expenses, and that his employment was definitely terminated by said resolution on March 19, 1914.

This left as the only significant issues in the case plaintiff's right to reimbursement for expenses, and to pay for the days he claimed to have been in defendant's employ after March 19, 1914.

Beyond what was said in the interview at Jackson,

nothing definite is shown to have been directly said by either party in the nature of an agreement as to what compensation he should receive. Neither he nor Davis testify to any agreement on the subject during his preliminary visit to Alpena on November 22d, or on November 26th when he returned and began work. While they do not fully agree as to what passed between them on November 22d plaintiff's only statement in regard to cost or compensation is:

"He told me somewhat more in detail than I had learned in Jackson about the family quarrel, and after listening to it I told him I thought they had rather an unpleasant mess here, but as to the real thing that they wanted me to come for, after going down to the office and meeting Mr. White and looking at the accounts and his books, I told Mr. Davis that I was satisfied Mr. White understood his business as near as I could tell, and that I refused to set any estimate on what the whole job cost because I couldn't tell and the only way I would work was as I stated in Jackson on a per diem basis of $10 per day and expenses, that is when I was away from home. There was much more talk, but it seems to me that it was the substance of it."

While Davis testified:

"When Mr. Humphrey was here on the 22d of November, 1913, no arrangements were made other than that he was to ascertain what it was going to cost us. He did nothing to ascertain, so far as I saw, for he spent his time with me and could have spent but a short time looking over the books, * * * I talked with him about ascertaining how long it would take. He said he wasn't ready to take hold of it just yet and had to go back. * * * When Mr. Humphrey left on the 22d I didn't make any arrangement with him to come back."

There is a direct issue between plaintiff and the three directors as to plaintiff's adding expenses to his per diem statement of charge in the interview at Jackson. They testified he answered to their inquiry that

if employed his wages would be $10 per day and did not mention expenses, while he testified that he told them his charges would be $10 a day and expenses. He, however, returned to Alpena and commenced work on the 26th of November, remaining, apparently with Davis' acquiescence, until into the ensuing April, and rendered bills at different times for services and expenses, some of which were paid. The trial court rightly held, we think, that under all the circumstances shown the question of expenses was an issue of fact for the jury, and submitted it to them under proper instructions.

Upon the question of compensation after March 19th the court expressed a serious doubt during the progress of the trial as to that being a question for the jury, but finally submitted it to them as an issue of fact. This involves the most serious assignment of error in the case. Aside from the authority given Davis by the resolution passed at Jackson to communicate with plaintiff on the subject of his possible employment and ascertain the probable cost, and whether his audit would suffice if steps were taken to bond, etc., as stated, no action was ever taken by defendant's board of directors upon the subject until at a regular meeting held in Alpena on February 24, 1914, when the time and nature of his employment were discussed, the following resolution was unanimously adopted:

"*Whereas*, It is uncertain what expenses and time will be used in auditing the books of the Onaway-Alpena Telephone Company as at present they are being audited; be it—

"*Resolved*, That Henry Humphrey, as the auditor, be paid ten dollars ($10.00) a day for his services, he to pay his own expenses. Be it further—

"*Resolved*, That the president of this board be empowered to employ Robert Crable of Alpena, or some other auditor, to assist the present auditor of the company, Henry Humphrey, at such stipend as he shall deem proper. Be it further—

"*Resolved,* That the present employed auditor, Henry Humphrey, shall not be employed for more than twenty (20) working days from this date. Be it further—

"*Resolved,* That said auditors make and submit to the president of this company within said twenty (20) days, a report in writing of the entire work of auditing; such report to be full and complete to date."

At this meeting other conditions unsatisfactory to the board were found and Clark's employment as general manager was terminated. A resolution was passed that said Clark "be and he is hereby discharged and relieved and released from his said duties as general manager of the company from this date and moment forward, and such duties and the authority incident thereto be and the same hereby are placed upon Charles S. Davis, without additional compensation."

Plaintiff was soon notified of this. He testified that he remembered that meeting, and that Clark handed him an unsigned paper in an envelope, the next day he thought, which he opened when he got to his room. The paper was introduced in evidence and is as follows:

"At a meeting of the board of directors of the Onaway-Alpena Telephone Company, held February 24th, the matter of work and compensation of the auditor now working on the books, Mr. Henry Humphrey, was freely discussed.

"It was stated by president Davis that although no definite understanding as to hotel expenses was had, that he thought Mr. Humphrey should pay his own hotel bill, or at least board at a place which he, Mr. Davis, considered good enough for himself.

"The president was empowered to employ Mr. Crable of Alpena to assist Mr. Humphrey for a time, it being understood that Mr. Crable would, while working with Mr. Humphrey, be able to get such information from Mr. Humphrey and his notes, and that he, Mr. Crable, would be able to continue work after Mr. Humphrey had been discharged.

"He was further empowered to require of Mr. Humphrey that his work be completed and a written report made of the same within 20 working days from that date, and to not pay him any further sums of money until such written report was made."

The trial court held that this unsigned paper not being a copy of the resolution actually passed by the board of directors, was not of itself a notice that his employment terminated at expiration of 20 working days from February 24th, and against defendant's request for a directed verdict on the proposition under consideration held that whether plaintiff had actual notice was a question of fact, charging the jury on that assumption as follows:

"The resolution was passed, and I say to you as the law that the board of directors had a right to pass that resolution giving it effect 20 days from the date of its passage, and that if Mr. Humphrey from any source was fully apprised of the terms of that resolution, he would not have a right after the 19th of March to assume to remain in the employ of that company; and if he did so with that knowledge, he could not recover after the 19th of March for either compensation for his time or for his hotel or other expenses.

"He denies, gentlemen, and it is fair to say that he takes the position that he did not have any such knowledge as that, and you will remember that he was served that day with a paper made, I think, on the same typewriter that the resolution was made upon, not signed by any one, but served upon him by Mr. Clark, one of the directors, and I will read it to you. * * *

"Now, that is not any declaration that Mr. Humphrey's services must terminate 20 days after that meeting. It says: 'He was further empowered to require of Mr. Humphrey that his work be completed and a written report made of same within 20 working days;' and I charge you that if that is all the notice that Mr. Humphrey had of that resolution and its contents, and afterwards Mr. Davis acquiesced in and authorized him to remain there longer than the

period of 20 days, he would be entitled to his pay and expenses, if you find that he was entitled to the expenses under the contract during the time that he remained there until he was finally discharged. But he must sustain that contention by a fair weight of the evidence."

In any aspect of this question it appears undisputed that plaintiff never advised the board of directors or any of its officers of the probable cost or length of time it would take him to examine the books of the company and audit its accounts. He made a special trip to Alpena at defendant's expense to look matters over, after being advised that information was desired, but states he did not go up to ascertain the time the work would take, did not and could not tell that, or the probable cost, and said:

"The purpose of my coming up at that time and staying one day and then going back was to satisfy Mr. Allen and the people there at Jackson."

Whatever the nature of his hiring in the first instance, it is clear that it was not for any special length of time, neither was it by any special resolution of the board of directors. Plaintiff states, "I had no dealing with any one but Mr. Davis." To what extent the individual members were previously advised is not shown, and perhaps immaterial, but the time when his employment would end was definitely fixed by a resolution of the board at the time the matter came before it on February 24, 1914. Plaintiff testified that he never saw this resolution and claimed for that reason he was not bound by it. The court correctly instructed the jury that if plaintiff was fully apprised of its terms from any source he would have no right to assume to remain as an employee of the company; but in view of his position "that he did not have any such knowledge as that," which the court thought there was testimony to support, the question was left

to the jury with the instruction that "he must sustain that contention by a fair weight of the evidence."

It is not contended that the board ever ratified Davis' claimed continuance of plaintiff's employment after the 20 days, but his theory apparently is that under the paper served upon him by Clark, by which he was entitled to be governed in the absence of knowledge to the contrary, Davis had authority to continue him at work indefinitely if his report was not made. He testified that Davis had spoken to him about the resolution, and the 20-days feature, and a report being gotten out in that time, and said:

"When that time came I went to Mr. Davis and I says, 'Now this report isn't finished or the examination isn't finished.' Of course it was due to be finished according to the resolution. But man can't do impossible things; and I said, 'The 20 days are up; now if you want me to go home, I don't care anything about staying any longer, any more than this report is the first job I ever got at I didn't finish up. I don't like to leave things in this shape.' 'Well,' he said, 'I don't know; that was the resolution of the board, but I think your work ought to be rounded out. There ought to be some kind of a report made to let the stockholders know what we spent this money for, and I think that the stockholders will do justice to you, or the board will do justice to you, and I certainly shall use my influence to do the fair thing, but I cannot say further than that.'"

It would seem that this in itself was sufficient to put plaintiff, with his experience and knowledge of how corporate business should be conducted, on guard as to the authority of the agent with whom he was dealing. In a letter written Allen in October, before he was hired, he had emphasized the importance in investigating corporation matters of first knowing "that the record is straight and that everything done has the authority of the stockholders or directors, as the case may be, back of it."

In *Hurley* v. *Watson*, 68 Mich. 531, the general principle is thus stated:

"If there is anything likely to put a reasonable business man upon his guard as to the authority of the agent, it is the duty of the third party to inquire how far the agent's acts are in pursuance of the principal's limitation."

It was shown without question that the minutes of the directors' meeting of February 24th, containing the resolution of which plaintiff admits he heard, was properly written up and officially signed in the book kept for such purpose, and was in the office among the books of the corporation where he worked and to which he had access. Asked about this he said, "I had access to the minutes of the meeting, so far as I know." Asked, "And you didn't have interest enough in it (the resolution) to open the book and see what was passed there relative to your employment?" he replied, "No, I didn't go snooping around."

Even conceding that, under the generally recognized implied powers of the president and general manager of a corporation to obligate it in the transaction of its usual and ordinary business arising in the course of its conduct, Davis had authority to hire an expert accountant to conduct a special audit of the financial affairs of this telephone company to the extent and at the expense claimed here, his powers in that particular were ended by this resolution. Not only must any important transaction of a corporation out of the usual course of its ordinary business be authorized by the board of directors, but the president as ministerial officer or agent of a corporation has no implied power to obligate it by any act or contract which in effect overrules or revokes action taken by its board of directors in relation to the same matter. 10 Cyc. p. 909.

It is true as noted by the trial court, the testimony

of Davis and plaintiff is at variance in frequent particulars as to just how and to what extent direct knowledge of the resolution was brought home to plaintiff, but the conclusion is made unavoidable beyond issue of fact from his own testimony that he had ample notice of the resolution so far as it related to and fixed the limit of his employment before the 20 days expired. Davis testified that the next day after the resolution was passed plaintiff told him he had heard that a resolution had been introduced at that meeting discharging plaintiff and employing Robert Crable in his place, and Davis then told him what had taken place, saying:

"I told him that a resolution had been passed whereby he should close his work in 20 working days following February 24th and that he was to submit a report at the end of that time. Mr. Humphrey said it having been conveyed to him in some way that Mr. Crable was to take his place; and I told him that Mr. Crable had been employed to assist him by the resolution."

And that he had a conversation with him later in which the matter of a report was discussed, and he then told him if he stayed beyond the 20 days it would be on his own responsibility as the board of directors had taken the matter out of Davis' hands and left him no option. Concededly Davis' testimony is only conclusive against plaintiff to the extent he admits the facts, but he was asked and answered in relation to this during his cross-examination, as follows:

"Within a few days after the 24th of February, 1914, Mr. Davis informed you that the board of directors of this company had fixed the date after which you were not to be employed, at 20 days after the date of that meeting. Didn't he tell you so?

"A. Sometime within that time; sometime a few days afterward he told me of the action. * * *

"Q. With reference to the notification—your notification of the resolution which has been introduced

here, which is said to have been passed on February 24th, you heard what Mr. Davis said in regard to that, as to whether or not you were notified of it the next day?

"A. Yes.

"Q. Was that true?

"A. I don't think it was; no. I would say no because I—my observation is about that, that it was two or three days later. I don't care, I had just as soon it would be the next day as not, but I don't think it was. I don't care what day it was."

Recalled later in rebuttal plaintiff was examined by his counsel in relation to the paper Clark had handed him, of which he stated he never said a word to Clark nor told Davis he had it until just before he left, which he then told Davis he "had concluded to show him," which he did, and Davis "brustled up" and denied its truth. After he had apparently finished his testimony in that connection, his examination in the case concluded:

"I ask you finally whether Mr. Davis ever notified you that you must quit within 20 days?

"A. No, sir, he—

"Q. Explain it if there is something you want to say?

"A. All right. He notified me that I must quit. He told me of the action taken by the board of directors at a meeting requiring my completion and requiring my report, a written report in a certain time, and that was 20 days from a certain date, the date of the resolution, but it was, as I have already testified here, that at the end of the 20-day period I went to Mr. Davis and I said to him, 'The demand to finish a report—make an examination and make a written report, I couldn't comply with it because I haven't got the information to make it from; I haven't concluded.' And he also told me in that conversation about getting Mr. Crable to assist me in the work."

Re-cross-examination by defendant's counsel:

"You don't claim now to change any testimony given yesterday, do you, Mr. Humphrey?

"*A.* No, sir, not a word of it.

"*Mr. Henry:* That is all.

"*A.* That is, unless it is an accidental word sometimes, but not the substance of my testimony."

Whether this concluding testimony on rebuttal was intended to relate to the time when plaintiff quit or prior interviews, it does not change the material substance of his former testimony, which clearly shows he had early notice of the resolution and its import from the president of the company, who fairly informed him that his employment beyond the 20 days was made by that resolution a matter for the board, which he thought would do justice, etc., concluding, however, with the warning, "but I cannot say further than that."

Plaintiff's own testimony leaves no issue for the jury on that branch of the case.

The judgment therefore is reversed, with costs to defendant, and a new trial granted.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.